21-07388MB(JR)

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Oscar A. Ramirez, being duly sworn, depose and state as follows, to wit:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) assigned to the FBI Tucson Resident Agency, in Tucson, Arizona. I have been a Special Agent since February 2000. I am responsible for investigating violent crimes occurring within Indian Reservations and have investigated these types of crimes almost exclusively throughout my FBI career. I have been involved in numerous investigations relating to violent crimes which have included participation in searches and seizures of digital evidence, including computers and digital media like cellular telephones, the arrests and interviews of subjects in said investigations, and the forensic examination of digital evidence obtained in said investigations.

2. As a Special Agent I am authorized to investigate violations of the laws of the Unites States, and to execute arrest and search warrants issued under the authority of the United States.

3. The statements contained in this Affidavit are based on my experience and background as a law enforcement officer and on information provided by other law enforcement agents. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. I make this affidavit in support of an application for a search warrant to allow any authorized law enforcement officer to search a black Samsung Galaxy A21 cell phone, (hereinafter referred to as "TARGET PHONE").

5. Based on facts set forth in this affidavit, I believe there is probable cause to believe that the TARGET PHONE contains evidence in the form of communication and/or digital records,

and that the evidence is relevant and material to the investigation of this crime, which occurred within the exterior boundaries of the Pascua Yaqui Indian Reservation

6. The purpose of this application is to seize and search evidence, more particularly described in Attachment A, of violations of Title 18 U.S.C. §§ 1111, 1153, 113(a)(1) and 924(c).

7. No prior attempt by investigative or legal process has been submitted to obtain the same or similar information sought in this warrant application.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

8. The property to be searched consists of one (1) cell phone (TARGET PHONE). The cell phone to be examined is black in color and manufactured by Samsung with a clear case and a photograph of a young woman, IMEI: 354231112266914 (picture herein attached of cellular phone). The TARGET PHONE is currently in the physical custody of the FBI, in Tucson, AZ.

9. The requested warrant would authorize the forensic examination of the TARGET PHONE for the purpose of identifying electronically stored data to include: any telephone numbers, including but not limited to numbers called, numbers stored for speed dial, pager numbers, names and addresses, electronically stored voice and text messages, calling card numbers, text messages, photos, videos and/or identifying information that may be stored in the memory of the TARGET PHONE, as more fully described in Attachment B.

## PROBABLE CAUSE

10. On May 11, 2021, at approximately 3:37AM, the Pascua Yaqui Police Department received a 911 call from John Hamilton (J. HAMILTON), and he requested a welfare check on Silas

2

Gallardo (GALLARDO), who was believed to be in his father, S.G.'s, home. J. HAMILTON called police on behalf of his wife, Nicole Hamilton (N. HAMILTON).

11. Pascua Yaqui Police Department (PYPD) officers met N. and J. HAMILTON at the residence of S.G. N. HAMILTON was still on her cellular phone with GALLARDO. Nicole told the officers that GALLARDO had called her earlier in the morning, but the call had disconnected. After several failed attempts to get ahold of GALLARDO, N. HAMILTON finally reached him. N. HAMILTON told officers that GALLARDO sounded unwell, was not making sense, and was repeating himself. N. HAMILTON told PYPD Officer Alex Gonzales she was worried because GALLARDO told her he did something but would not tell her what he had done. PYPD Officer Juan Pallanes began to knock on the door. GALLARDO opened the door just enough to make eye contact with PYPD Officer Pallanes and then shut the door. GALLARDO was unwilling to open the front door until N. HAMILTON began to talk to him. While GALLARDO was talking to N. HAMILTON, PYPD Officer Pallanes could see a pool of a reddish brownish substance on the ground, which he believed to be blood. PYPD Officer Pallanes pushed the door in and saw an adult male lying face down in the living room and blood under the body. PYPD Officer Pallanes told GALLARDO to put his cell phone (TARGET PHONE) down. GALLARDO placed the TARGET PHONE on top of the refrigerator. PYPD Officers detained GALLARDO and cleared the home, rendering it safe.

12. S.G. was identified as being the deceased male on the living room floor. The Pascua Yaqui Fire Department arrived at the residence and did not produce any signs of life.

13. N. HAMILTON was interviewed by the FBI on May 11, 2021. During her interview, she explained that she got a suspicious call from GALLARDO at 1:33AM. GALLARDO left her home on Sunday night, May 9, 2021, to go visit his father. GALLARDO hung up on N.

HAMILTON and would not pick up her returning calls. At 1:42AM GALLARDO answered his cell phone and appeared to be confused. Later that morning, while N. HAMILTON was still on the phone with GALLARDO, she and J. HAMILTON drove to S.G.'s home. N. HAMILTON denied hearing her son mention he had done something to his father or about the shooting. N. HAMILTON asked GALLARDO to talk to his father and GALLARDO told her, "I don't think so." After numerous attempts to have GALLRDO open the door, police were called.

14. On May 11, 2021, a federal search warrant was executed at the residence of S.G. During the execution of the warrant, the TARGET PHONE was found on top of the refrigerator and was seized. The TARGET PHONE has remained in the custody of the FBI since being seized.

15. GALLARDO was interviewed on May 11, 2021. During his interview, GALLARDO initially told investigators he did not know what happened and he kept hoping it did not happen. After further questioning, GALLARDO provided investigators with a timeline of events leading up to the murder of S.G., his father. GALLARDO told investigators he usually communicates with his father using Facebook Messenger. GALLARD stated he remembered ingesting some mushrooms inside S.G.'s home at approximately 11:00 to 11:30 p.m. on May 10, 2021. GALLARDO laid down in the living room and began to experience irrational thoughts. GALLARDO walked into a bedroom and woke S.G. up. GALLARDO was scared and asked S.G. if he was going to hit him. S.G. said no. GALLARDO stated he did not remember exactly what happened next. GALLARDO remembered running to the refrigerator inside the living room, getting his gun from on top of the refrigerator and pulling it out of the holster. GALLARDO. became emotional and began to cry. GALLARDO stated, "I'm so sorry dad." When asked how many times he shot the gun, GALLARDO stated he did not count.

4

GALLARDO stated he did not remember shooting his father.

16. GALLARDO told investigators that after the shooting, he began to pace around the living room holding the gun and then called his mother. GALLARDO told investigators he told N. and J. HAMILTON that he had shot and killed his father. GALLARDO remembered being asked several questions about his brother and sister. GALLARDO believed his parents were afraid he had also shot them. GALLARDO told investigators he tried calling his mother several times before she answered. GALLARDO stated he also called his girlfriend Celeste, but she was still sleeping. GALLARDO also tried calling his sister Anastacia Hamilton. Gallardo told investigators his cell phone was a Samsung cellular phone. When asked why he called his mother after the shooting, GALLARDO told investigators he needed love. Based on all of these facts, I believe that the TARGET PHONE seized during the execution of a search warrant at S.G.'s home contains evidence related to the murder of S.G.

## TECHNICAL TERMS

17. Wireless telephone: A wireless telephone (or mobile telephone or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving and storing text messages and e-mail; taking, sending, receiving, and storing still

photographs and moving video; storing and playing back audio files; storing dates, appointments and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

18. Digital camera: A digital camera is a camera that records pictures and video as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos. Most cell phones currently manufactured contain digital cameras as a standard feature.

19. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such

as a calendar, contact list, clock or games. Most cell phones currently manufactured contain portable medial players as a standard feature.

20. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state. Most cell phones currently manufactured allow the use of the Internet as a standard feature. Further, most current cell phones allow the user to transmit electronic messages via standard email services or specially designed communication applications between parties.

21. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device; evidence of where such persons were when they possessed or used the device; evidence of who such persons were with when they possessed or used the device; evidence of persons with whom they communicated when they possessed or used the device; evidence of text, email, other electronic messaging applications and voice mail communications between the person who possessed or used the device and others. Navigational coordinates may also be transmitted to and/or from these devices to determine the user's location through a GPS application.

22. Facebook Messenger: Facebook Messenger is a communication service/application developed by Facebook, Inc. The messaging application can transmit alphanumeric text

7

messages, pictures, audio and videos from a software application installed on a user's cellular device to another application on the cellular device of one or more users. The communication service can also support voice and video calling.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

23. Based on my knowledge, training and experience, I know that electronic devices such as the TARGET PHONE in this case, can store information for long periods of time. Similarly, things that have been viewed via or uploaded to the Internet are typically stored for some period of time on the device. Additionally, computer files or remnants of such files can be recovered even if they have been deleted. This is because when a person "deletes" the information on an electronic device, the data does not actually disappear, rather, the data remains on the storage medium until it is overwritten by new data. Information described in this affidavit can often be recovered by forensic computer experts using forensic tools and software.

24. As further described in this affidavit and Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the TARGET PHONE was used, where it was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence will be on the TARGET PHONE is more fully set forth in the factual section contained herein and because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file, including frequency channels, text messages, video, or photographs.

b. Forensic evidence on a device can also indicate who has used or controlled the devices. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity of how an electronic device works may, after examining the forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, when and where, sometimes it is necessary to establish that a particular thing is not present on a storage medium, for example, the absence of the entry of a name in a contact list as evidence that the user(s) of the TARGET PHONE did not have a relationship with the party.

## CONCLUSION

25. Based on the foregoing information, there is probable cause to believe that the TARGET PHONE contains evidence, fruits, and instrumentalities of criminal offenses, in violation of Title 18 U.S.C. §§ 1111, 1153, 113(a)(1), and 924. The examination of TARGET PHONE may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant. Because this warrant only seeks permission to examine devices already in the possession of the FBI, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the TARGET PHONE described in Attachment A to seek the items described in Attachment B.

Oscar A. Ramirez, Special Agent
Federal Bureau of Investigation

Subscribed and sworn telephonically
this 8th day of September, 2021.

Honorable Jacqueline Rateau
United States Magistrate Judge
District of Arizona

10

21-07388MB(JR)

## ATTACHMENT A

## ITEMS TO BE SEARCHED

1. One black in color Samsung cell phone with a clear case and a photograph of a young woman, IMEI: 354231112266914 (picture attached of phone).

The TARGET PHONE is currently in the physical custody of the FBI in Tucson, AZ.



21-07388MB(JR)

## ATTACHMENT B

## ITEMS TO BE SEIZED

1. All records including call records, text messages, email, or third-party applications on the cellular telephones described in Attachment A that relate to violations of 18 U.S.C. §§ 1111, 1153, 113(a)(1), and 924(c);

2. Evidence of user attribution showing who used or owned the cellular telephones described in Attachment A at the time the items described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, and documents;

3. Photographs and/or videos of any violations of 18 U.S.C. §§ 1111, 1153, 113(a)(1) and 924(c) and any/all activities from May 9, 2021 until May 11, 2021;

4. Any and all notes, documents, records, manifestos, lists, plans, or correspondence, (including, but not limited to, e-mail messages, chat logs and electronic messages, and other digital data files) related to violations of 18 U.S.C. §§ 1111, 1153, 113(a)(1) and 924(c) from May 9, 2021 until May 11, 2021;

5. Any and all data pertaining to the whereabouts of GALLARDO from May 9, 2021 until May 11, 2021;

6. Any and all data pertaining to GALLARDO'S state of mind from May 9, 2021 until May 11, 2021;

7. Any and all data pertaining to GALLARDO'S use or possession of alcohol, illegal drugs, prescription drugs and firearms;

8. Any and all data pertaining to threats or negative feelings towards S.G.;

9. Any online identifications or handles assigned to GALLARDO including but not limited to identifications for Twitter, Snapchat, Instagram, WhatsApp, Facebook, Facebook messenger, telegram, etc.; and

10. Any contacts, friends lists, address books, or related items.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.